**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

|                              |   |                              |
|------------------------------|---|------------------------------|
| **IN RE:**                   | § | **Case No. 25-51660-CAG**    |
|                              | § |                              |
| **COLLINS ASSET GROUP, LLC,**| § | **Chapter 7**                |
|                              | § |                              |
| **Debtor.**[1]               | § |                              |

**RON SATIJA, CHAPTER 7 TRUSTEE'S MOTION FOR ENTRY OF AN ORDER**
**AUTHORIZING THE CHAPTER 7 TRUSTEE TO SELL THE DEBTOR'S**
**ASSETS PURSUANT TO 11 U.S.C. § 363 AND GRANTING RELATED RELIEF**

> **THIS PLEADING REQUESTS RELIEF THAT MAY BE ADVERSE TO YOUR INTERESTS.**
>
> **ANY RESPONSE OR OBJECTION MUST BE TIMELY FILED ON OR BEFORE MARCH 13, 2026, WITH THE UNITED STATES BANKRUPTCY CLERK, WESTERN DISTRICT OF TEXAS, HIPOLITO F. GARCIA FEDERAL BUILDING AND UNITED STATES COURTHOUSE, 615 EAST HOUSTON STREET, ROOM 597, SAN ANTONIO, TEXAS 78205.**
>
> **A HEARING WILL BE HELD ON MARCH 23, 2026, AT 10:00 A.M. CENTRAL BEFORE THE HONORABLE CRAIG A. GARGOTTA, CHIEF UNITED STATES BANKRUPTCY JUDGE, AT HIPOLITO F. GARCIA FEDERAL BUILDING AND UNITED STATES COURTHOUSE, 615 EAST HOUSTON STREET, COURTROOM #3, 5TH FLOOR, SAN ANTONIO, TEXAS 78205. IF YOU DO NOT ATTEND THE HEARING, THE COURT MAY DECIDE THAT YOU DO NOT OPPOSE THE MOTION.**

**TO THE HONORABLE CRAIG A. GARGOTTA, CHIEF U.S. BANKRUPTCY JUDGE:**

Ron Satija, Chapter 7 Trustee (the "Trustee") for the bankruptcy estate (the "Estate") of Debtor Collins Asset Group, LLC ("Collins" or the "Debtor"), in the above-captioned chapter 7 bankruptcy case (the "Case"), files this *Motion for Entry of an Order Authorizing the Chapter 7*

---

[1] The last four digits of this Debtor's federal tax identification number are 3148. This Debtor's address is 6001 W. William Cannon Drive, Suite 102, Austin, Texas 78749.

*Trustee to Sell the Debtor's Assets Pursuant to 11 U.S.C. § 363 and Granting Related Relief* (the "Sale Motion")[2] and in support hereof, the Trustee respectfully states as follows:

## I.     PRELIMINARY STATEMENT

1.     By this Sale Motion, the Trustee seeks entry of an order (the "Sale Order"), substantially in the form attached hereto as **Exhibit A**: (i) authorizing the Trustee to sell the Assets to the Successful Bidder (as defined in the Sale Procedures Motion) free and clear of liens, claims and encumbrances and (ii) granting related relief.  The Trustee has executed with the Successful Bidder a certain *Purchase Agreement*, a copy of which is attached hereto as **Exhibit B** and which the Court has set on its March 23, 2026, at 10:00 a.m. Central docket.[3]

2.     Granting the relief requested in this Sale Motion will allow the Trustee to realize significant value that will inure to the benefit of the Estate, creditors, and stakeholders in this Case.

## II.     JURISDICTION AND VENUE

3.     The Court has jurisdiction to consider this Sale Motion pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M), (N), and (O).  Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

4.     The bases for the relief requested herein are sections 105(a) and 363 of title 11 of the United States Code (as amended and modified, the "Bankruptcy Code"); Rules 2002, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and Local Rule

---

[2] Capitalized terms used but not defined herein shall have the terms ascribed to it in the *Expedited Motion of Ron Satija, Chapter 7 Trustee, for Entry of an Order (A) Approving Sale Procedures for Sale of the Debtor's Assets, (B) Setting an Auction and Final Hearing to Approve Sale of Debtor's Assets, (C) Approving Form and Manner of Sale, Auction, and Sale Hearing, and (D) Granting Related Relief* [ECF No. 231] (the "Sale Procedures Motion"), the Sale Procedures Order (as defined below), or the Sale Notice [ECF No. 254], as applicable.

[3] Declarations of the Trustee and a representative of Garnet (as defined below) will be filed on the docket in this Case in support of this Sale Motion and designated as exhibits at the March 23, 2026 Sale Hearing.

9014-1 of the Bankruptcy Local Rules for the Western District of Texas (the "<u>Bankruptcy Local Rules</u>").

### III.  BACKGROUND

5.      On June 4, 2025 (the "<u>Petition Date</u>"), Collins filed its voluntary petition for relief under chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, Case No. 25-10994 (LSS).  George L. Miller was appointed as the chapter 7 trustee in Delaware prior to the transfer of the Case to this District.

6.      On June 25, 2025, John Patrick Lowe, state-court receiver over Ferrum Capital, LLC and Ferrum IV, LLC (the "<u>Receiver</u>"), and various plaintiffs (collectively, the "<u>Plaintiffs</u>") filed their *Motion of Plaintiffs and Receiver of Ferrum Capital, LLC and Ferrum IV, LLC to Transfer Venue of Bankruptcy Cases* [ECF No. 22] (the "<u>Venue Transfer Motion</u>"), seeking a transfer of venue of the Debtor's Case from Delaware to this District.

7.      After notice and a hearing on July 25, 2025, the Honorable Laurie S. Silverstein granted the Venue Transfer Motion and entered the *Order Granting Motion of Plaintiffs and Receiver for Ferrum Capital, LLC and Ferrum IV, LLC to Transfer Venue of Bankruptcy Cases* [ECF No. 76], transferring the Case to this District.

8.      On August 5, 2025, the United States Trustee for the Western District of Texas filed the *Notice of Appointment of Successor Trustee and Fixing of Bond* [ECF No. 94], appointing Ron Satija as Trustee for the Estate in the Case as of August 1, 2025.

9.      Prior to the Petition Date, Collins was a debt buyer and debt collection company that reported collection accounts on consumer credit reports. Collins historically purchased many types of debt accounts, including credit card, auto loan, student loan, medical debt, and other types of consumer debt. Since fall 2021 when Collins' former owner, Walt Collins, was bought out of Collins' ownership structure, the servicing of the Assets was either done by an affiliated company

of Oliphant, Inc.[4] or by an external servicing company, which would enter into one or more subservicing agreements for the Portfolios with one or more of the Oliphant Entities.

10.     On October 10, 2025, the Court entered an *Order* [ECF 154] approving the *Expedited Application of Ron Satija, Chapter 7 Trustee, for Approval of Employment of Garnet Capital Advisors, LLC as Broker to the Chapter 7 Trustee* [ECF No. 141], approving the Trustee's employment of Garnet Capital Advisors, LLC ("Garnet") as broker in the Case.

11.     On December 31, 2025, the Trustee filed the Sale Procedures Motion.

12.     On January 15, 2026, the Court entered the *Order Granting Expedited Motion of Ron Satija, Chapter 7 Trustee, for Entry of an Order (A) Approving Sale Procedures for Sale of the Debtor's Assets, (B) Setting An Auction and Final Hearing to Approve Sale of Debtor's Assets, (C) Approving Form and Manner of Sale, Auction, and Sale Hearing, and (D) Granting Related Relief* [ECF No. 244] (the "Sale Procedures Order"), which (a) authorized and approved the Sale Procedures in connection with a contemplated Sale Transaction of the Assets; (b) authorized an Auction of the Assets and set the Sale Hearing on March 23, 2026 at 10:00 a.m. (prevailing Central Time); (c) authorized and approved the form and manner of Sale Notice; and (d) and granted related relief, as more fully set forth in the Sale Procedures Motion.

13.     On March 2, 2026, the Trustee filed the *Notice of Auction Results and Designation of Successful Bidder* [ECF No. 281] (the "Notice"), selecting the Qualified Bid of Meadow River Investments II, L.L.C. as the highest and best bid for the Debtor's Assets.  Further, the Notice designated Meadow River Investments II, L.L.C. as the Successful Bidder for the Debtor's Assets. The gross purchase price of the Successful Bid by the Successful Bidder is $5,214,100.00.

---

[4] On or around October 2023, Collins and Hollins Holdings, Inc. were removed as affiliated entities of Oliphant, Inc. and its other affiliated entities and subsidiaries (collectively, the "Oliphant Entities").

The Successful Bidder has already tendered its deposit in the amount of $1,042,819.97 to Garnet pursuant to the *Purchase Agreement*.  The Successful Bidder and the Trustee are prepared to close the Sale Transaction on March 27, 2026, pending Court approval and entry of the Sale Order.

14.    Paragraph V of the Sale Notice provides that prior to the Sale Hearing, the Trustee will "seek the entry of an order authorizing and approving, among other things, the Sale Transaction of the Assets."  *See* Sale Notice, p. 5, ¶ V.  Thus, the Trustee files this Sale Motion.

## IV.    RELIEF REQUESTED AND BASIS FOR RELIEF

### A.    The Sale of the Assets is Authorized Under 11 U.S.C. § 363(b)(1).

15.    At the conclusion of the Sale Hearing, the Trustee requests that the Court enter the Sale Order approving the Sale Transaction of the Assets to the Successful Bidder.  The Trustee submits that the Sale Transaction of the Assets is in the best interest of the Estate and its creditors.

16.    Bankruptcy Code section 363(b)(1) provides that the trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).

17.    Here, the Trustee has not received any indication that any of the allegedly secured creditors, including the Receiver and The Heller Group, LLC & Judith Heller TTEE, Judith Heller Revocable Trust (1/7/1988) (together, the "Allegedly Secured Creditors"), of the Estate objects to the Assets being sold pursuant to 11 U.S.C. § 363(f).  Further, Trustee's counsel provided a copy of the executed *Purchase Agreement* to counsel for the Allegedly Secured Creditors and has answered various questions presented.  As a result, the Trustee believes that he may sell the Assets subject to the protection of a valid and unavoidable lien of an allegedly secured creditor that attaches to the proceeds, notwithstanding the protections provided to the Trustee and the Estate under 11 U.S.C. § 506(c).

18.     To approve the use, sale, or lease of property outside the ordinary course of business, this Court need only determine that the Trustee's decision is supported by "some articulated business justification," as established by the Second Circuit Court of Appeals in *In re Lionel Corp)*, 722 F.2d 1063, 1070 (2nd Cir. 1983), which decision has been adopted in the Fifth Circuit Court of Appeals.  *See In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991); *In re San Jacinto Glass Indus., Inc.*, 93 B.R. 934, 944 (Bankr. S.D. Tex. 1988).

19.     Once the trustee articulates a valid business justification, "presumption that in making a business decision, the trustee. . . will act on an informed basis, in good faith, and in the honest belief that actions to be taken on behalf of the debtor are in the best interest of the debtor, its estate and creditors."  *In re Johns*, No. 21-60010-rlj7, 2024 Bankr. LEXIS 2865, at *9–*10 (Bankr. N.D. Tex. 2024) (internal citations omitted).  Thus, if a trustee's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(f) of Bankruptcy Code.  *See Gluckstadt Holdings, L.L.C. v. VCR I, L.L.C. (In re VCR I, L.L.C.)*, 922 F.3d 323, 326 (5th Cir. 2019); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) ("As long as [the sale] appears to enhance a debtor's estate, court approval of a [trustee's] decision to [sell] should only be withheld if the [trustee's] judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.").

20.     When applying the business judgment standard, courts show great deference to a trustee's business decisions.  *See GBL Holding Co. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (N.D. Tex. 2005) (citing *In re Gulf States Steel*, 285 B.R. 497, 516 (Bankr. N.D. Ala. 2002) (citations omitted)).

21.     The Trustee respectfully submits that his proposed Sale Transaction of the Assets to the Successful Bidder outside the ordinary course of business fits squarely within the parameters of the sound business judgment test.  As set forth above, the Trustee, in his business judgment and in consultation with his legal counsel and Garnet, has determined that it is in the best interest of the Estate to consummate the Sale Transaction of the Assets to the Successful Bidder.  In order to monetize the Estate's Assets for distribution to creditors, it is critical that the Trustee is permitted to complete the Sale Transaction of the Assets to the Successful Bidder pursuant to this Sale Motion and any Sale Order entered by the Court.

22.     The Trustee knows with certainty that the Successful Bid's gross purchase price obtained pursuant to the Court-approved Sale Procedures, and as detailed in the *Purchase Agreement*, was the highest and best offer for the Assets received by Garnet through the Sales Procedures.  The Sale Transaction presented in connection with this Sale Motion is warranted, necessary, and appropriate under 11 U.S.C. § 363(b), and the Sale Order should be entered by the Court.

**B.      The Sale of the Assets Free and Clear of Liens, Claims, and Interests is Authorized Under 11 U.S.C. § 363(f).**

23.     The Trustee respectfully requests that the Sale Transaction and transfer of the Assets to the Successful Bidder be approved free and clear of all liens, claims, encumbrances, and other interests, with any such alleged interests attaching to the net proceeds of the Assets to the extent applicable.  Such relief is consistent with the provisions of section 363(f) of the Bankruptcy Code in this type of Case.

24.     Bankruptcy Code section 363(f)(2) authorizes a trustee to sell assets free and clear of liens, claims, interests, and encumbrances of an entity other than the estate if such entity consents.  *See* 11 U.S.C. § 363(f)(2).  This provision is supplemented by Bankruptcy Code section

105(a), which provides that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

25.     Because 11 U.S.C. § 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the Sale Transaction of the Assets free and clear of the interests.  *See In re Nature Leisure Times, LLC*, No. 06-41357, 2007 Bankr. LEXIS 4333, at *7 (Bankr. E.D. Tex. Dec. 19, 2007) ("The language of § 363(f) is in the disjunctive such that a sale free and clear of an interest can be approved if any one of the aforementioned conditions contained in § 363(f) are satisfied."); *Mich. Emp. Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive and holding that the court may approve the sale "free and clear" provided at least one of the subsections of section 363(f) is met).

26.     The Trustee is confident that one or more of the tests under 11 U.S.C. § 363(f) will be satisfied with respect to the Sale Transaction and transfer of the Assets pursuant to a Sale Order to the Successful Bidder.  Notably, the Trustee understands that the Allegedly Secured Creditors do not object to the proposed Sale Transaction and, in fact, _support_ the relief requested in this Sale Motion.  The Trustee further believes sections 363(f)(3) & (5) may also be satisfied.  Regardless, the requirements of section 363(f) of the Bankruptcy Code can be satisfied, and the Sale Transaction of the Assets to the Successful Bidder free and clear of all liens, claims, encumbrances, and other interests is appropriate and necessary in this Case.

**C.     The Stay of the Sale Order Should be Waived.**

27.     Bankruptcy Rule 6004(h) provides that an order authorizing the use, sale or lease of property is stayed until the expiration of 14 days after the entry of an order, unless the court orders otherwise. *See* FED. R. BANKR. P. 6004(h).

28.     The Trustee request that the Sale Order be effective immediately by providing that the 14-day stays under Bankruptcy Rule 6004(h) is waived.  To require the Trustee to effectively be liable and/or responsible for the Assets for an extra fourteen (14) days and to needlessly delay closing in the event the parties are otherwise prepared to close on a more accelerated timeline would cause additional burden on the Estate and require further expenditures of the Estate's limited resources that are not necessary.

### V.     PRAYER

WHEREFORE, the Trustee respectfully requests that the Court enter the Sale Order, substantially in the form attached hereto as __Exhibit A__, authorizing him to sell the Assets to the Successful Bidder free and clear of all liens, claims, encumbrances, and other interests, and grant him such other and further relief as the Court may deem just and proper.

Dated: March 11, 2026                 Respectfully submitted,

**DYKEMA GOSSETT PLLC**

By:  */s/ Danielle Rushing Behrends*
     Danielle Rushing Behrends
     State Bar No. 24086961
     dbehrends@dykema.com
     Dominique A. Douglas
     State Bar No. 21434409
     ddouglas@dykema.com
     112 East Pecan Street, Suite 1800
     San Antonio, Texas 78205
     Telephone: (210) 554-5500
     Facsimile: (210) 226-8395

**COUNSEL TO RON SATIJA,
CHAPTER 7 TRUSTEE**

## CERTIFICATE OF CONFERENCE

I hereby certify that I have conferred with Royal Lea, counsel to the Receiver, and Lester A. Ottenheimer, III, counsel to The Heller Group, LLC & Judith Heller TTEE and Judith Heller Revocable Trust 1/7/1988 on the relief requested herein. I was unable to confer with Growth Platform, LLC; F&K Partners, LLP; and Sill & Associates, L.L.C., as they have not contacted the Trustee or requested notice pursuant to Bankruptcy Rule 2002. Messrs. Lea and Ottenheimer support the relief requested herein.

*/s/ Danielle Rushing Behrends*
Danielle Rushing Behrends

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of March, 2026, the foregoing document was served electronically on those registered to receive notice though the Court's CM/ECF service, including:

| | |
|---|---|
| United States Trustee for the Western District of Texas<br><br>615 E Houston, Suite 533<br>San Antonio, TX 78205<br>**via CM/ECF** | Collins Asset Group, LLC, Debtor<br><br>6001 W. William Cannon Dr<br>Suite 102<br>Austin, TX 78749<br>**via CM/ECF through its attorney** |
| Oliphant Financial, LLC<br><br>c/o Michael Ridulfo and Abigail Rogers<br>Kane Russell Coleman Logan PC<br>401 Congress Avenue,<br>Suite 2100<br>Austin, TX 78701<br>**via CM/ECF through its attorney** | Oliphant USA, LLC<br><br>c/o Michael Ridulfo and Abigail Rogers<br>Kane Russell Coleman Logan PC<br>401 Congress Avenue,<br>Suite 2100<br>Austin, TX 78701<br>**via CM/ECF through its attorney** |
| John Patrick Lowe, as state-court receiver for Ferrum Capital, LLC<br><br>2402 East Main Street<br>Uvalde, TX 78801<br>**via CM/ECF** | Counsel to Musgrove Plaintiffs<br><br>Randall A. Pulman<br>Kerry Alleyne-Simmons<br>Pulman LeFlore Pullen & Reed LLP<br>2161 NW Military Highway, Suite 400<br>San Antonio, TX 78213<br>**via CM/ECF through their attorneys** |
| Counsel to John Patrick Lowe, as state-court receiver for Ferrum Capital, LLC<br><br>Royal Lea<br>Royal Lea Law Office<br>1901 NW Military Highway #218<br>San Antonio, TX 78213<br>**via CM/ECF through his attorney** | Counsel to The Heller Group, LLC & Judith Heller TTEE, Judith Heller Revocable Trust (1/7/1988)<br><br>Lester A. Ottenheimer, III<br>750 W. Lake Cook Road, Suite 290<br>Buffalo Grove, IL 60089<br>**via CM/ECF through their attorney** |
| | Any party that has requested notice pursuant to Bankruptcy Rule 2002<br>**via CM/ECF** |

I also certify that the foregoing document was served via U.S. first-class mail on the attached service list on March 11, 2026.

*/s/ Danielle Rushing Behrends*
Danielle Rushing Behrends

**EXHIBIT A**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| | § | **Case No. 25-51660-CAG** |
| **COLLINS ASSET GROUP, LLC,** | § | |
| | § | **Chapter 7** |
| **Debtor.** [1] | § | |
| | § | |

**ORDER GRANTING RON SATIJA, CHAPTER 7 TRUSTEE'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE CHAPTER 7 TRUSTEE TO SELL THE DEBTOR'S ASSETS PURSUANT TO 11 U.S.C. § 363 AND GRANTING RELATED RELIEF**

This matter came before the Court on the *Motion for Entry of an Order Authorizing the Chapter 7 Trustee to Sell the Debtor's Assets Pursuant to 11 U.S.C. § 363 and Granting Related Relief* (the "Motion"),[2] filed by Ron Satija, Chapter 7 Trustee (the "Trustee") over the bankruptcy estate of Debtor Collins Asset Group, LLC ("Collins" or the "Debtor"). Through the Motion, the Trustee seeks entry of an order pursuant to sections 105(a) and 363 of title 11 of the United States

---

[1] The last four digits of this Debtor's federal tax identification number are 3148. This Debtor's address is 6001 W. William Cannon Drive, Suite 102, Austin, Texas 78749.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed in the Motion.

127196.000001 4911-0010-5110.1

1

Code (the "Bankruptcy Code"), Rules 2002, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 9014-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Western District of Texas, authorizing and approving the sale (the "Sale Transaction") of the Debtor's assets (the "Assets") to the Successful Bidder based on its Successful Bid and on the terms in the executed *Purchase Agreement*, a copy of which was attached to the Motion as Exhibit B, pursuant to 11 U.S.C. § 363 and granting related relief, as more fully set forth in the Motion.  The Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been given as provided in the Motion, and such notice having been adequate and appropriate under the circumstances; and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion; and the Court having held a hearing (the "Sale Hearing") to consider the relief requested in the Motion as to the Sale Procedures and relief granted by this Order; and upon the record of the Hearing; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interest of the Estate, its creditors, and all parties in interest; and the Trustee having demonstrated good, sufficient, and sound business justification for the relief approved herein; and upon the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

1.      The Trustee has articulated good and sufficient business reasons for the Court to approve the Motion pursuant to 11 U.S.C. § 363.

2.      The *Purchase Agreement* was negotiated and entered into in good faith, from arm's-length bargaining positions without collusion or fraud, by the Trustee and the Successful Bidder.

3.      Good and sufficient notice of the relief sought in the Motion has been provided under the circumstances, and no other or further notice is required. A reasonable opportunity to object and be heard regarding the relief granted herein has been afforded to all parties in interest, including those persons and entities entitled to notice pursuant to Bankruptcy Rule 2002.

4.      Garnet, on behalf of the Trustee, diligently and in good faith marketed the Assets to secure the highest and best offer. The Successful Bidder's Successful Bid represents a fair and reasonable purchase price for the Assets, constitutes the highest and best offer obtainable for the Assets, and constitutes reasonably equivalent value under the Bankruptcy Code.

5.      The closing of the Sale Transaction with the Successful Bidder will allow the Trustee to realize significant value that will inure to the benefit of the Estate, creditors, and stakeholders in the Case.

6.      The Successful Bidder has acted in good faith and is a good faith purchaser, entitled to the protections set forth in 11 U.S.C. § 363(m).

7.      The transfer of the Assets to the Successful Bidder is or will be a legal, valid, and effective transfer of the Assets and will vest in the Successful Bidder with all right, title, and interest in and to the Assets, free and clear of any and all liens, claims, encumbrances, and other interests.

8.      Neither the Trustee nor the Successful Bidder has engaged in any conduct that would cause or permit the *Purchase Agreement* or the Sale Transaction contemplated thereby to be avoided or avoidable, or costs or damages to be imposed, under 11 U.S.C. § 363(n).

127196.000001 4911-0010-5110.1

3

9.      The Successful Bidder is not an "insider" or "affiliate" of the Debtor (as defined in the Bankruptcy Code).

10.     Time is of the essence in consummating the Sale Transaction.  The Court finds that this is cause to waive the stay imposed by Bankruptcy Rule 6004(h).

**THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

11.     The Motion is **granted** in its entirety.

12.     All objections to the relief herein that have not been withdrawn, waived, or settled are overruled.

13.     The Sale Transaction contemplated in this Order is properly authorized under 11 U.S.C. § 363.

14.     The date of closing of the Sale Transaction shall occur on March 27, 2026, or as otherwise agreed by the Trustee and the Successful Bidder.

15.     Pursuant to 11 U.S.C. § 363(f), the Assets shall be transferred to the Successful Bidder, and, upon closing of the Sale Transaction, the Assets shall be free and clear of any and all liens, claims, encumbrances, and other interests, with any such alleged interests attaching solely to the net proceeds of the Assets to the extent applicable, notwithstanding the protections provided to the Trustee and the Estate under 11 U.S.C. § 506(c).

16.     The Trustee is authorized and empowered to and, upon entry of this Order, has all the power and authority necessary to consummate and effectuate the Sale Transaction with the Successful Bidder.

17.     No other or further consents or approvals of this Court are required for the Trustee to consummate or effectuate the Sale Transaction with the Successful Bidder.

18.     Notwithstanding the applicability of any of Bankruptcy Rules 6004(h), 9014, or any other provisions of the Bankruptcy Rules or the Local Rules stating the contrary, the terms and provisions of this Order shall be immediately effective and enforceable upon its entry, and any applicable stay of the effectiveness and enforceability of this Order is hereby waived.

19.     The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

# # #

Submitted by:

Danielle Rushing Behrends
State Bar No. 24086961
dbehrends@dykema.com
Dominique A. Douglas
State Bar No. 21434409
ddouglas@dykema.com
DYKEMA GOSSETT PLLC
112 East Pecan Street, Suite 1800
San Antonio, Texas 78205
Telephone: (210) 554-5500
Facsimile: (210) 226-8395

**COUNSEL TO RON SATIJA,**
**CHAPTER 7 TRUSTEE**

**EXHIBIT B**

# PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (this "Agreement") is entered into this 27th day of March, 2026, by and between Ron Satija, Chapter 7 Trustee ("Seller"), for the bankruptcy estate of Debtor Collins Asset Group, LLC ("Debtor"), in TXWB Case No. 25-51660-cag, pending in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division and Meadow River Investments II, L.L.C., an Ohio limited liability company ("Buyer").

## W I T N E S S E T H :

WHEREAS, on June 4, 2025, Debtor filed with the United States Bankruptcy Court for the District of Delaware a Voluntary Petition for Relief under Chapter 7 of the Bankruptcy Code;

WHEREAS, on July 25, 2025, such case was transferred to the United States Bankruptcy Court for the Western District of Texas, San Antonio Division (the "Bankruptcy Court");

WHEREAS, on August 1, 2025, the Bankruptcy Court appointed Ron Satija as successor Chapter 7 Trustee of Debtor;

WHEREAS, Seller is entrusted with the management and sale of the bankruptcy estate of Debtor, which includes certain Accounts (as defined herein);

WHEREAS, on January 15, 2026, the Bankruptcy Court entered an order (a) approving sale procedures for sale of the Debtor's assets, (b) setting an auction and final hearing to approve sale of the Debtor's assets, (c) approving form and manner of sale, auction and sale hearing, and (d) granting related relieve (the "Sale Procedures");

WHEREAS, Seller desires to sell certain Accounts to Buyer and Buyer desires to purchase such Accounts from Seller, all in accordance with the terms and subject to the conditions contained in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises herein set forth and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Buyer agree as follows:

## ARTICLE I
## DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings indicated:

"Account" means each and any of the consumer charge-off accounts identified on the Account Schedule to be sold by Seller to Buyer under the terms, conditions and provisions of this Agreement and includes for each of the Accounts, all obligations owed to Seller from each Obligor with respect to each Account (including any deficiency), all rights, powers, liens or security interests of Seller with respect to any such Account, and the interest of Seller in any litigation or bankruptcy to which Seller is a party or claimant relating to any of the Accounts.

"Account Balance" means the unpaid balance owed on any individual Account as of the Cutoff Date and as reflected on the Account Schedule.

"Account Classification" means the classification shown on the Account Schedule for the sole purpose of specifying certain matters herein.

**"Account Documents"** means, to the extent applicable, the original or copy (whether paper or imaged) of the note, installment agreement or other documentation evidencing an Account.

**"Account Schedule"** means the schedule, in electronic form, identified as <u>Exhibit A</u> and made a part hereof, setting forth the following information for each Account as of the Cutoff Date: the Account number, the name of primary Obligor, the Account Balance, the Allocated Purchase Price and the Account Classification.

**"Adjustment Request Deadline"** means the date that is ninety (90) days after the Closing Date.

**"Agreement"** means this Purchase Agreement, including the cover page and all Addenda, Exhibits and Schedules hereto.

**"Allocated Purchase Price"** means the individual price of any Account sold hereby which is calculated as the product of the Purchase Price Percentage and the Account Balance for such Account.

**"Amount Due at Closing"** means the remaining portion of the Purchase Price due Seller, as set forth on the Settlement Statement.

**"Business Day"** means a day of the week, other than a Saturday, a Sunday, a federal holiday or any other holiday recognized in the State of Texas on which banks are permitted to be closed for business.

**"Buyer Wiring Instructions"** means the wire instructions provided by Buyer to the Escrow Agent.

**"Closing"** means the execution and delivery of all property, funds, documents, and assignments for the transactions contemplated in this Agreement, as provided for in this Agreement.

**"Closing Date"** means March 27, 2026.

**"Computer File"** means the data file or files provided by Seller to Buyer prior to or on the Closing Date. The Computer File shall contain Account-specific information for each of the Accounts sold hereby.  The Computer File shall reflect data as of the Cutoff Date. The Computer File includes NPI.

**"Current Legal Account"** means the any of the Pre-Legal Accounts, Legal Accounts and Judgment Accounts that are currently placed with an attorney as of the Cutoff Date.

**"Cutoff Date"** means 11:59 pm on October 21, 2025.

**"Deposit"** means an amount equal to twenty percent (20%) of the Purchase Price.

**"Downstream Buyer"** means any third-party who acquires Accounts from Buyer or a successor(s) to Buyer.

**"Escrow Agent"** means Garnet Capital Advisors, LLC.

**"Escrow Account"** means the non-interest-bearing account maintained by Escrow Agent at Peapack Gladstone Bank.

**"Escrow Account Wiring Instructions"** means the wire instructions provided by Escrow Agent to Buyer.

**"Former Legal Account"** means the any of the Pre-Legal Accounts, Legal Accounts and Judgment Accounts that were previously placed with an attorney but have been recalled prior to the Cutoff Date.

**"Holdback Account"** means the non-interest-bearing account maintained by Escrow Agent at Peapack Gladstone Bank.

**"Holdback Agreement"** means the Holdback Agreement attached hereto as <u>Exhibit I</u>.

**"Holdback Amount"** means an amount equal to ten percent (10%) of the Purchase Price.

**"Judgment Account"** means any Account which, as of the Cutoff Date, has been reduced to judgment.

**"Legal-Non-Judgment Account"** means any Account which, as of the Cutoff Date, has had collection litigation initiated but has not yet been reduced to judgment.

**"Liquidity"** means the ability to receive full or partial payment from or on behalf of an Obligor, applicable to one or more Accounts.

**"Loan Sale Advisor"** means Garnet Capital Advisors, LLC.

**"NPI"** means certain Nonpublic Personal Information as defined in Title V of the Gramm-Leach-Bliley Act 15 U.S.C. §6801 et seq. concerning Obligors ("<u>NPI</u>") that Buyer will receive from Seller in connection with the transfer of Accounts under this Agreement.

**"Obligor"** means the current and unreleased natural person(s) on an Account including, without limitation, any and all co-makers, guarantors, judgment debtors or other persons or entities liable on the Account.

**"Off-Bureau Account"** means an Account that has passed the date for obsolescence provided for in Section 605(a) of the Fair Credit Reporting Act, 15 U.S.C. § 1681c.

**"Original Creditor"** means the entity which originated an Account.

**"Out-of-Statute Account"** means an Account that has passed the applicable statute of limitations date for such Account.

**"Pre-Legal Account"** means any Account which, as of the Cutoff Date, is or was placed with an attorney for collection litigation but the litigation has not yet been initiated.

**"Proof of Claim"** means a submitted Form B410 (Official Form 410) to the United States Bankruptcy Court.

**"Purchase Price"** means the amount, in dollars, to purchase the Accounts on the Closing Date as reflected on the Settlement Statement, which equals the aggregate Allocated Purchase Prices.

**"Purchase Price Percentage"** means a percentage for each Account according to the Account Classification as follows:

| Account Classification | Purchase Price Percentage |
| --- | --- |
| Paid 2025 Forward | 20.00% |
| Residual | 0.03026140% |

**"Sale Order"** means an order of the Bankruptcy Court authorizing the sale of the Accounts to the Buyer free and clear of liens, claims, interests and encumbrances except as specified therein.

**"Seller Wiring Instructions"** means the wire instructions provided by Seller to Escrow Agent.

**"Settlement Statement"** means the settlement statement, substantially in the form of <u>Exhibit E</u>, which reflects the Amount Due at Closing.

**"Transfer Documents"** means the Bill of Sale and Assignment.

## ARTICLE II
## PURCHASE AND SALE OF THE ACCOUNTS

**Section 2.1**    <u>**Agreement to Sell and Purchase Accounts.**</u>  Subject to the terms and conditions of this Agreement, on the Closing Date, Seller will sell, and Buyer will purchase, the Accounts described in the Account Schedule.

**Section 2.2**    <u>**Account Schedule.**</u> The Account Schedule sets forth all of the Accounts which Buyer has agreed to purchase on the Closing Date.

**Section 2.3**    <u>**Deposit.**</u>

On the first Business Day following the full execution of this Agreement, Buyer will deliver the Deposit to the Escrow Agent using the Escrow Account Wiring Instructions. Escrow Agent shall hold the Deposit in the Escrow Account and disburse the Deposit as described in <u>Section 2.4</u> using the Buyer Wiring Instructions or Seller Wiring Instructions, as applicable.

Escrow Agent may rely and act upon any instrument or other writing reasonably believed by Escrow Agent to be genuine and purporting to be signed and presented by any person or persons purporting to have authority to act on behalf of Seller or Buyer, as the case may be, and shall not be liable in connection with the performance of any duties imposed upon the Escrow Agent by the provisions of this Agreement, except for Escrow Agent's own gross negligence or willful misconduct.  Escrow Agent shall have no duties or responsibilities except those set forth herein.

If Escrow Agent timely receives a notice of objection to disbursement of the Deposit prior to disbursement of the Deposit as set forth herein, Escrow Agent shall continue to hold the Deposit until (i) Escrow Agent receives written notice executed by both Seller and Buyer directing the disbursement of Deposit, or (ii) the final determination of the Bankruptcy Court after the expiration of all applicable appeals periods.

Notices for matters relating to amounts held in the Escrow Account shall be made by email to the designee below for each party:

| | Name | Email |
|---|---|---|
| To Buyer: | ████ | ████████████████ |
| To Seller: | ████ | ███████████ |
| To Escrow Agent: | ███ | ██████████████ |

Prior to disbursing any amounts equal to or exceeding $5,000, Escrow Agent shall confirm by telephone the wiring instructions to be used for such disbursement with the designee for the recipient party as follows; such recipient must provide the following PIN as part of the confirmation: ███.

|  | Name | Phone Number |
|---|---|---|
| Buyer: | ███ | ███ |
| Seller: | ███ | ███ |

Escrow Agent shall be reimbursed by Seller and Buyer for any expenses (including reasonable legal fees and disbursements of outside counsel), including all of Escrow Agent's fees and expenses with respect to any dispute between Buyer and Seller incurred in connection with this Agreement, and such liability shall be joint and several; provided, however, that, as between Buyer and Seller, the prevailing party (as determined by the Bankruptcy Court after the expiration of all applicable appeals periods) in any dispute shall be entitled to reimbursement by the losing party of any such expenses paid to Escrow Agent.

**Section 2.4**     **Payment of the Amount Due at Closing.**

(a) On or before 1:00 p.m. Eastern time on the Closing Date, Buyer shall pay the Amount Due at Closing to Escrow Agent by wire transfer in immediately available funds to the account specified in the Settlement Statement.

(b) Following Escrow Agent's receipt of the Amount Due at Closing, it shall subtract (x) the fees and expenses due Escrow Agent pursuant to its engagement letter that was approved by the Bankruptcy Court and (y) the Holdback Amount, and then disburse such remaining funds to Seller by wire transfer in immediately available funds to an account specified by Seller to Escrow Agent.

(c) An amount equal to the Holdback Amount shall be retained by Escrow Agent in the Holdback Account pursuant to the Holdback Agreement.

**Section 2.5**     **Closing Deliverables.**

On the Closing Date, each of Buyer, Seller and Escrow Agent shall execute and deliver a signed counterpart of the Holdback Agreement.

On the Closing Date, immediately following the receipt of the Amount Due at Closing, Seller shall deliver to Buyer scanned copies of the following documents:

(a) Bill of Sale and Assignment. A Bill of Sale and Assignment, in the form of Exhibit B hereto. Buyer shall be responsible at its own expense for the recording and/or filing of any such assignments as it deems necessary or appropriate in its sole discretion.

(b) Limited Power of Attorney. A Limited Power of Attorney, in the form of Exhibit C.

(c) Waiver of Notice of Transfer of Claim. A Waiver of Notice of Transfer of Claim, in the form of Exhibit G.

(d) Affidavit. An Affidavit of Sale of Accounts by Debt Seller, in the form of Exhibit F.

    (e) <u>Settlement Statement</u>. A copy of the Settlement Statement.

    (f) <u>Sale Order</u>. A copy of the Sale Order.

Upon request of Buyer, Seller shall provide original "wet" signed copies of the documents described in this Section 2.5.

**Section 2.6**    **UCC Filings by Buyer.** Immediately upon the sale of the Accounts to Buyer from Seller on the Closing Date and at any time thereafter, Buyer may file, in each appropriate office any UCC financing statement, and any amendments or any continuation statements thereto, required to perfect the sale of Accounts by Seller to Buyer.

**Section 2.7**    **Apportionment of Costs.** Except as otherwise specifically provided in this Agreement, each party will be responsible for all fees, costs and expenses it incurs in connection with the negotiation, execution, delivery and performance of this Agreement and the transactions contemplated hereby.

**ARTICLE III**
**POST-CLOSING MATTERS**

**Section 3.1**    **Delivery of Post-Cutoff-Date Payments.**

    (a) Seller shall pay over and deliver all payments or other consideration received by Seller with respect to any Account after the Cutoff Date within fifteen (15) days after the end of the month in which any such payment is received. Such payments shall be delivered with an endorsement by Seller in the form substantially as follows: "Pay to the order of Meadow River Investments II, L.L.C. without representations, warranties, and without recourse." Such payments shall be (i) without interest thereon from Seller, (ii) less any commissions due to any third-party collection agencies or attorneys for payments received, and (iii) less any out-of-pocket costs incurred by any third-party collection agencies or attorneys after the Cutoff Date. At Seller's option, Seller may provide a credit to the Amount Due at Closing for such amounts that are known as of the time the Settlement Statement is completed, less any associated expenses.

    (b) Seller shall indicate on the records related to any of the Accounts transmitted to Buyer with the payment remittances the following information:

- account number;
- date of receipt of the payment;
- amount of the payment; and
- any other detail reasonably required to allow Buyer to properly post the payments to its collection system.

    (c) If Seller has deposited payments received from any Obligor and issues a check or payment therefor to Buyer, Buyer shall retain the risk that any such payment so deposited by Seller shall be returned due to insufficient funds. Seller shall have a period of thirty (30) days after the date Seller delivers to Buyer payments made by or on behalf of any Obligor on or after the Closing Date, to notify Buyer in writing that any such payments were returned due to insufficient funds and specifying the amount thereof, whereupon Buyer shall immediately, and not later than 30 days following receipt of such notice, pay to Seller the amount of such payment.

(d) Seller shall forward payments and other consideration to Buyer using the following information, which may be updated by Buyer upon written notice to Seller at any time after execution of this Agreement:

Buyer Wiring Instructions or, in case of forwarding checks, to Buyer addressed as follows:



Name:
Email:
Phone Number:

**Section 3.2** **Delivery of Account Documents.** Within ten (10) Business Days following the Closing Date, Seller shall provide all digitized Account Documents in its possession to Buyer. Buyer has the right to retrieve, at Buyer's cost, all physical Account Documents from King Size Storage, 5256 West US Highway 290, Austin, Texas 78735 by March 31, 2026. After March 31, 2026, Seller may permanently destroy all physical Account Documents.

**Section 3.3** **Forwarding Notices / Correspondence.** If Seller shall receive notices or correspondence related to any Account after the Closing Date, it shall promptly forward the same to Buyer, but in no case more than thirty (30) days of receipt.

**ARTICLE IV**
**SERVICING/COLLECTION**

**Section 4.1** **Servicing/Collection After Closing Date.** The Accounts shall be sold and conveyed to Buyer on a servicing-released basis. As of the Closing Date, all rights, obligations, liabilities and responsibilities with respect to the servicing of the Accounts shall pass to Buyer, and Seller shall be discharged from all servicing liability therefore. Buyer shall have no right to communicate with any Obligor or otherwise take any action with respect to any Account or any Obligor until after the Closing Date. Buyer shall be responsible for fees and out-of-pocket costs incurred by any third-party agencies or attorneys incurred after the Cutoff Date, which may be netted out of payment remittances in accordance with Section 3.1, but otherwise for which Buyer shall be directly responsible.

**Section 4.2** **Notification to Obligors.** Buyer acknowledges and agrees to make written notification to Obligors of the transfer of the Accounts to Buyer within thirty (30) days of the Closing Date and direct all future payments to be made to Buyer's address; provided, however, that neither party shall be required to send notifications to Obligors subject to bankruptcy. Buyer shall send such notifications to all Obligors that have made a payment within the 12 month period prior to the Closing Date, and which Accounts are still deemed as active. Buyer shall comply with all applicable laws regarding notifications to Obligors.

**Section 4.3** **Debt Collection of Accounts.** If Buyer collects or attempts to collect on an Account, Buyer will, and will cause its agent(s), at all times to:

(a) comply with all applicable state and federal laws, rules, statutes, and regulations including, without limitation, the Consumer Credit Protection Act, the Telephone Consumer Protection Act, the California Rosenthal Fair Debt Collection Practices Act, the EFT Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Servicemembers Civil Relief Act, state debt collection laws, as well as all regulations of the Consumer Financial Protection Bureau;

(b)  comply with the Gramm-Leach-Bliley Act, the Equal Credit Opportunity Act, the Federal Trade Commission Act, and the Dodd-Frank Act;

(c)  maintain licensure, insurance, bonding, registration, as required by all jurisdictions where Buyer attempts to collect on an Account;

(d)  maintain and abide by an established written information technology security plan to protect Account information in accordance with applicable laws and regulations, including but not limited to those pertaining to the protection of personal information (e.g., MA 201 CMR 17.00) and that is designed to meet the objectives as set forth in the Interagency Guidelines Establishing Information Security Standards; Final Rule (12 CFR Part 30, et al.); and

(e)  not engage in any unfair, deceptive, or abusive acts or practices.

**Section 4.4**     **Use of Seller's Name.**  Buyer will not use or refer to the name of Seller and will not portray itself as Seller's agent, partner, or joint venturer with respect to the Accounts; provided, however, Buyer may use the name of Seller or Original Creditor for purposes of identifying an Account in communications with the Obligors or in the caption of any litigation against Obligor (so long as it is apparent that Seller are not set forth in such caption as the party plaintiff) in order to collect amounts outstanding on the Accounts.  In contacting an Obligor, filing suit, or selling Accounts, Buyer will not state or represent in any way that Buyer is contacting the Obligor, filing suit or selling loans for or on behalf of Seller or that any of the above will take any action with regard to the Account or the Obligor.

**Section 4.5**     **Documents and Records.**  Buyer agrees, at its sole cost and expense, to abide by all applicable state and federal laws, rules and regulations regarding the handling and maintenance of all Accounts and all documents and records relating to the Accounts purchased hereunder including, but not limited to, the length of time such documents and records are to be retained and making any disclosures to Obligors as may be required by law.

**Section 4.6**     **Reporting to Credit Bureaus.**  For those Accounts which Seller was reporting to credit reporting agencies on the Closing Date, Seller will send an update to the appropriate credit reporting agencies to delete its reporting for all Accounts.

**Section 4.7**     **Bankruptcy Proceedings.**  After the Closing Date, Buyer will be solely responsible for ascertainment and compliance with any bankruptcy stays or orders and for obtaining any judicial relief or making any proof of claim in bankruptcy court.  Within 30 days following the Closing Date, Buyer shall file a transfer of claim for each active Chapter 13 Bankruptcy Account.

**Section 4.8**     **Assignment of Judgments.**  Buyer shall prepare and file an assignment of judgment for all Judgment Accounts within ninety (90) days following the Closing Date.

**Section 4.9**     **Seller-Initiated Collection Litigation.**

(a)  Current Legal Accounts are listed on Exhibit N.  Seller shall assign to Buyer its contracts with the attorneys with whom the Current Legal Accounts are placed within three (3) Business Days following the Closing Date if allowed by Seller's agreement with the applicable law firm.

(b) Buyer shall prepare and file an assignment of judgment for all Judgment Accounts upon Buyer's receipt of a schedule of all Judgment Accounts, which shall include Obligor's name, account number, docket number, judgment date, judgment amount, jurisdiction, and law firm such Account is placed with. For a period of ninety (90) days from Closing, Buyer may request Seller execute individual assignments as may be required in the applicable jurisdiction. Buyer shall be permitted to request such assignment be made in the name of any permitted assignee subject to Section 9 of this Agreement. Buyer shall be obligated to provide the necessary account information to support such assignment at the time of request.

(c) Buyer shall make best efforts to substitute itself as the party litigant for all Legal Non-Judgment Accounts within ninety (90) days following the Closing Date. Seller shall provide Buyer a schedule of all Legal Non-Judgment Accounts, which shall include Obligor's name, account number, and law firm such Account is placed with.

(d) To the extent Buyer does not assign Judgment Accounts or substitute itself as a party litigant for all Legal Non-Judgment Accounts as referenced in Section 4.9(a)-(c) above and the actions of Buyer result in any claims against Seller, Buyer agrees to indemnify, defend and hold Seller its officers, directors, attorneys, partners, employees and assignees harmless from and against any and all liability, losses, damages, costs, penalties and expenses (including, without limitation, attorneys' fees) (collectively, "Losses") arising out of or relating to (i) any and all claims or complaints of any person or entity with respect to any of the methods, procedures, devices, or communications employed or made by the Buyer after the Closing Date, (ii) Buyer's failure to comply with any applicable federal, state or local law, rule or regulation, including, without limitation, the Federal Fair Debt Collection Practices Act (collectively, "Requirements of Law") after the Closing Date, (iii) negligent or willful misconduct or violation of any applicable law, rule or regulation by Buyer (or its employees or owners, members or partners) in connection with the collection or enforcement against any Debtor after the Closing Date, (iv) Buyer's failure to comply with any of the terms and conditions of this Agreement. Seller and Buyer shall each promptly provide the other with written notice of any claim, suit or action which may give rise to a right of indemnification under this paragraph. The failure of Seller to give prompt notice shall not relieve Buyer of its obligations to indemnify hereunder except to the extent Buyer is prejudice by such failure. If any such claim, suit or action of any kind is commenced against Seller, Buyer will, if requested by Seller, assume at Buyer's expense the defense of such claim, suit or action and Buyer shall be liable for the costs and expenses thereof, including, without limitation, attorney's fees. Seller in its sole discretion, may retain its own counsel and defend such claim, suit or action. Buyer will cooperate fully with Seller and its counsel in any claim, suit or action.

## ARTICLE V
### SELLER'S RIGHT TO REPURCHASE ACCOUNTS

**Section 5.1**     **Accounts Affected.** Seller shall have the right to repurchase or adjust any Account that has been recalled or adjusted.

**Section 5.2**     **Procedure for Account Refund or Adjustment.** Seller shall promptly notify Buyer in writing of the identity of such Accounts, and Buyer shall promptly cease releasing, collecting, or compromising the Account after Buyer receives Seller's notice.

Seller shall refund or adjust to Buyer the Allocated Purchase Price for such Account, less any amounts collected by Buyer after the Cutoff Date and prior to Buyer's receipt of Seller's notification. The repurchase price shall be paid to Buyer within 30 days after Seller's receipt of the documents and instruments required to reassign such Account to Seller.

# ARTICLE VI
## SELLER'S OBLIGATION TO ADJUST ACCOUNTS

Section 6.1    **Accounts Affected.**  Subject to the Holdback Agreement and upon written notice from Buyer received no later than the Adjustment Request Deadline, Seller will adjust any Account to which any of the following conditions applies:

(a)  on or prior to the Cutoff Date:

  (i)    Seller received payment in full settlement of the Account (including but not limited to issuance of Form 1099C);

  (ii)   Seller previously sold the Account or the Account was repurchased; and

(b)  prior to the Adjustment Request Deadline:

  (i)    the Account was created as a result of fraud or forgery such that all Obligors have no liability for such Accounts, such claims shall be substantiated by a police report or other commercially reasonable evidence;

  (ii)   the Obligor has initiated litigation or is included in a certified or proposed class action lawsuit as an actual or proposed member of a class, and such litigation is against Seller;

  (iii)  the Account is a duplicate record of any other Account being sold hereby.

Section 6.2    **Buyer's Obligation in Requesting Adjustment.**  For any Account which meets a condition set forth in Section 6.1, Buyer shall notify Seller before the Adjustment Request Deadline that such Account meets a condition described in Section 6.1. Such notice shall include detailed information and documentation regarding the basis for such request to demonstrate to Seller's reasonable satisfaction that the Account meets one of the stated conditions.

Section 6.3    **Price Adjustment Procedure.**  Within thirty (30) days of Seller's receipt of Buyer's notice and delivery to Seller of the evidence required under Section 6.2, Seller shall provide Buyer with an Account-level response to such request detailing which Accounts Seller agrees meet the Section 6.1 conditions and which Accounts Seller does not agree meet such conditions. The parties will work in good faith to come to agreement on which Accounts meet such conditions.

Subject to the terms of the Holdback Agreement, the adjustment shall be completed within five (5) Business Days following such agreement by Seller and Buyer both directing Escrow Agent to pay Seller or Buyer as the case may be, an amount equal to the Allocated Purchase Price paid for such Account, minus the Purchase Price Percentage for the updated or corrected Account Classification multiplied by the Account Balance.

To the extent no adjustment to the Purchase Price is requested by Buyer prior to the Adjustment Request Deadline, Escrow Agent shall release the funds held in the Holdback Account to Seller pursuant to the terms of the Holdback Agreement.

**Section 6.4**    **Limitation of Buyer's Right to Require Adjustment.**  Seller is not and shall not be obligated to adjust any Account as to which:

(a) the terms have been modified in any material respect by a written or oral agreement between Buyer and Obligor;

(b) Buyer has obtained full payment on the Account from Obligor or any guarantor or surety therefor, or otherwise accepted partial payment thereof in full satisfaction of the debt evidenced thereby;

(c) any of the Obligors have been released by Buyer; or

(d) Buyer has not provided evidence or proof reasonably satisfactory to Seller that the conditions set forth in <u>Section 6.1</u> are met.

## ARTICLE VII
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF BUYER

Buyer hereby represents, warrants and covenants, as of the date of this Agreement and as of the Closing Date as follows:

**Section 7.1**    **Independent Evaluation.** Buyer is a sophisticated investor, has knowledge and experience in financial and business matters that enable it to evaluate the merits and risks of the transaction contemplated by this Agreement, and that its bid for and decision to purchase the Accounts pursuant to this Agreement is and was based upon Buyer's own independent evaluation of information deemed relevant to Buyer, and of the information made available by Seller or Seller's personnel, agents, representatives or independent contractors to Buyer, which Buyer acknowledges and agrees were made available to it and which it was given the opportunity to inspect to its complete satisfaction.  Buyer has relied solely on its own investigation and has not relied upon any oral or written information provided by Seller or its personnel, agents, representatives or independent contractors other than those representations and warranties contained in this Agreement.  Buyer acknowledges and agrees that no employee, agent, representative or independent contractor of Seller has been authorized to make, and that Buyer has not relied upon, any statements other than those specifically contained in this Agreement. Buyer acknowledges that Seller has attempted to provide accurate information to Buyer but that Seller does not represent, warrant or insure the accuracy or completeness of any information or its sources of information contained in the materials submitted to Buyer except as provided herein.  Buyer has made such independent investigations as it deems to be warranted into the Liquidity and value of the Accounts, and all other facts it deems material to its purchase and is entering into this transaction solely on the basis of that investigation and Buyer's own judgment, and the covenants, representations and warranties in this Agreement.

**Section 7.2**    **Authorization.** Buyer is duly and legally authorized to enter into this Agreement and has complied with all laws, rules, regulations, charter provisions and bylaws to which it may be subject and that the undersigned representative is authorized to act on behalf of and bind Buyer to the terms of this Agreement.

**Section 7.3**      **Binding Obligations.** This Agreement and all of the obligations of Buyer hereunder are the legal, valid and binding obligations of Buyer, enforceable in accordance with the terms of this Agreement, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law).

**Section 7.4**      **No Breach or Default.** The execution and delivery of this Agreement and the performance of its obligations hereunder by Buyer will not conflict with any provision of any law or regulation to which Buyer is subject or conflict with or result in a breach of or constitute a default under any of the terms, conditions or provisions of any agreement or instrument to which Buyer is a party or by which it is bound or any order or decree applicable to Buyer, or result in the violation of any law, rule, regulation, order, judgment or decree to which Buyer or its property is subject.

**Section 7.5**      **No Implied Representations or Warranties.** Buyer acknowledges and agrees that the Accounts are sold, transferred, assigned and conveyed to Buyer on an "as is, where is" basis, with all faults, except as provided herein. Buyer acknowledges and agrees that all of the representations and warranties made by Seller to Buyer in connection with the Accounts are those specifically set forth in this Agreement and that Seller has made no other representation nor warranty, expressed or implied, to Buyer in connection with the Accounts.

**Section 7.6**      **Litigation, Regulatory Investigations.** There is no proceeding, action, investigation or litigation pending or, to the best of Buyer's knowledge, threatened against Buyer which, individually or in the aggregate, may have a material adverse effect on this Agreement or any action taken or to be taken in connection with Buyer's obligations contemplated herein, or which would be likely to impair materially its ability to perform under the terms of this Agreement. There are no material regulatory or governmental investigations or litigation against Buyer or Buyer's agents other than routine audits.

**Section 7.7**      **Approvals and Notices.** No consent, approval, authorization, or order of, registration or filing with, or notice to, any governmental authority or court is required under federal laws, or the laws of any jurisdiction, for the execution, delivery, and performance of or compliance by Buyer with this Agreement or the consummation of any other transaction contemplated hereby.

**Section 7.8**      **Economic Risk.** The transactions contemplated by this Agreement do not involve, nor are they intended in any way to constitute, the sale of a "security" or "securities" within the meaning of any applicable securities laws, and none of the representations, warranties or agreements of Buyer shall create any inference that the transactions involve any "security" or "securities". Buyer acknowledges, understands and agrees that the acquisition of these Accounts involve a high degree of risk and are suitable only for persons or entities of substantial financial means who have no need for liquidity and who can hold the Accounts indefinitely or bear the partial or entire loss of the value.

**Section 7.9**      **Nondisclosure.** Buyer is in full compliance with its obligations under the terms of the confidentiality agreement executed by Buyer to review the information made available by Seller or its personnel, agents, representatives or independent contractors to all potential bidders for the Accounts.

**Section 7.10**     **Identity.** Buyer is a "United States person" within the meaning of Paragraph 7701(a)(30) of the Internal Revenue Code of 1986, as amended.

**Section 7.11**     **Status of Buyer.** Buyer is a sophisticated purchaser that is in the business of buying or originating or collecting accounts of the type being purchased or that otherwise deals in such accounts in the ordinary course of Buyer's business. Buyer is, and shall remain at all times it engages in collection on any Accounts, appropriately licensed, bonded, registered and insured as required by all jurisdictions in which Buyer attempts to collect or collects a debt. Buyer shall, at its sole expense, maintain during the time that it collects Accounts: (i) general liability insurance with minimum coverage of two million dollars ($2,000,000) in the aggregate and one million dollars ($1,000,000) per occurrence; and (ii) professional liability insurance for errors and omissions with a limit of at least one million dollars ($1,000,000).

**Section 7.12**     **No Collusion.** Neither Buyer, its affiliates, nor any of their respective officers, partners, agents, representatives, employees or parties in interest (i) has in any way colluded, conspired, connived or agreed directly or indirectly with any other bidder, firm or person to submit a collusive or sham bid, or any bid other than a bona fide bid, in connection with the sale resulting in Buyer being the highest bidder for the Accounts subject to this Agreement, or (ii) has, in any manner, directly or indirectly, sought by agreement or collusion or communication or conference with any other bidder, firm or person to fix the price or prices, or to fix any overhead, profit or cost element of the bid price or the bid price of any other bidder at the sale resulting in Buyer being the highest bidder for the Accounts subject to this Agreement, or to secure any advantages against Seller.

**Section 7.13**     **Broker.** Buyer has not engaged any broker or agent in connection with this Agreement or the transactions contemplated by this Agreement or to which this Agreement relates and Buyer covenants to defend with counsel approved by Seller and hold harmless and indemnify Seller from and against any and all costs, expense or liability for any compensation, commissions and charges claimed against Seller by any broker or agent based upon a written agreement with Buyer relating to this Agreement or the transactions contemplated herein.

**Section 7.14**     **Limitation on Remedies.** Buyer understands and acknowledges that the sale of the Accounts is being conducted in a bankruptcy proceeding and is subject to Bankruptcy Court approval. Therefore, Buyer also understands and acknowledges that the funds in the Holdback Account shall be Buyer's sole and exclusive source of payment related to any claims Buyer may have against Seller, Seller's agents, or Loan Sale Advisor pursuant to this Agreement. Buyer further understands that the only claims to be made against the Holdback Account are for those authorized pursuant to Article VI and for claims made pursuant to an alleged breach by Seller of Sections 8.4 and 8.8. Any claims made as to the funds held in the Holdback Account shall be governed by the Holdback Agreement and the dispute resolution provisions therein.

**Section 7.15**     **Survival.** The representations, warranties and covenants set forth in this Article VII shall survive the closing of the transactions herein contemplated and the termination of this Agreement.

## ARTICLE VIII
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents, warrants and covenants, as of the date of this Agreement and as of the Closing Date as follows:

**Section 8.1**     **Authorization.** Pursuant to the Sale Procedures, Seller is duly and legally authorized to enter into this Agreement and has complied with all laws, rules, regulations, charter provisions and bylaws to which it may be subject and that the undersigned representative is authorized to act on behalf of and bind Seller to the terms of this Agreement, but subject to a final Sale Order.

**Section 8.2**     **Binding Obligations.** Subject to a final Sale Order, this Agreement and all of the obligations of Seller hereunder are the legal, valid and binding obligations of Seller, enforceable in accordance with the terms of this Agreement.

**Section 8.3**     **No Breach or Default.** The execution and delivery of this Agreement and the performance of its obligations hereunder by Seller will not conflict with any provision of any law or regulation to which Seller is subject or conflict with or result in a breach of or constitute a default under any of the terms, conditions or provisions of any agreement or instrument to which Seller is a party or by which it is bound or any order or decree applicable to Seller, or result in the violation of any law, rule, regulation, order, judgment or decree to which Seller or its property is subject.

**Section 8.4**     **Title to Accounts.** Seller is the lawful holder of clear and marketable title to the Accounts and is duly and legally authorized to sell, transfer, convey and assign its rights therein. Seller has not made any prior assignment, conveyance, transfer or sale of any of its rights or interests in the Accounts.

**Section 8.5**     **Compliance with Law.** To Seller's knowledge, the Accounts have been serviced and collected in accordance with all applicable laws.

**Section 8.6**     **Accounts Valid and Enforceable.** To Seller's knowledge, each Account represents the valid, enforceable, legal and binding obligation of the respective Obligor, except as may be limited by applicable law and excepting those Accounts that may have been otherwise sold, settled, adjudicated, or are otherwise eligible for adjustments pursuant to Article VI. This section shall not be construed as a representation of the Liquidity of any Account.

**Section 8.7**     **Collection/Contingent Fees.** Accounts may be subject to collection or contingency fees after the Closing Date for payments received after the Cutoff Date, in which case Seller shall remit payments to Buyer net of such third-party collection fees as described in Section 3.1, and (ii) may have out-of-pocket costs incurred after the Cutoff Date, for which Buyer shall be responsible as described in Sections 3.1 and 4.1.

**Section 8.8**     **Account Documents.** To Seller's knowledge, Account Documents provided pursuant to Section 3.2 are accurate.

**Section 8.9**     **Broker.** Seller has not engaged any broker or agent in connection with this Agreement or the transactions contemplated by this Agreement or to which this Agreement relates except Loan Sale Advisor for whose fees Seller shall be solely responsible in accordance with its agreement with Loan Sale Advisor.

Section 8.10     **Survival.** The representations, warranties and covenants set forth in this <u>Article VIII</u> shall survive the closing of the transactions herein contemplated and the termination of this Agreement.

EXCEPT FOR THOSE EXPRESSED IN THIS <u>ARTICLE VIII</u>, NO WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, HAVE BEEN MADE BY SELLER OR BY ANYONE ACTING ON ITS BEHALF. WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE FOREGOING, NO WARRANTIES OR REPRESENTATIONS HAVE BEEN MADE OR ARE MADE REGARDING (i) THE LIQUIDITY OF ANY THE ACCOUNTS, (ii) THE CREDITWORTHINESS OF ANY OBLIGOR WITH RESPECT TO ANY OF THE ACCOUNTS, OR (iii) THE VALUE OF ANY COLLATERAL SECURING PAYMENT OF ANY INDEBTEDNESS UNDER ANY OF THE ACCOUNTS.

## ARTICLE IX
## TRANSFER OR RESALE OF ACCOUNTS

Section 9.1     **Transfer or Resale.** Buyer may sell the Accounts to (i) one or more of its directly or indirectly wholly-owned entities or to one or more trusts established by such entities or pledge or create a security interest in the Accounts to or for a lender as collateral for a loan or (ii) an unrelated third-party. Such entities shall be considered Downstream Buyers.

Section 9.2     **Collateral Assignment by Buyer.** Buyer may collaterally assign, and grant a security interest in, the Accounts and this Agreement and all of Buyer's right, title and interest hereunder, to any lender (the "<u>Lender</u>"), from whom Buyer shall obtain financing, whether now or in the future. Seller consents to such collateral assignment and security interest and agrees to recognize and attorn to all rights of Lender as collateral assignee and secured party. Seller consents to any transfer of the Accounts to Lender upon the exercise by Lender of its remedies under any financing upon the occurrence of an event of default thereunder. To the extent Lender seeks to enforce rights of Buyer against Seller under this Agreement, Lender shall be subject to the same agreements made by Buyer in this Agreement as if it were Buyer. Nothing herein shall constitute an assumption by Lender, and Lender shall have no liability for, any of Buyer's obligations under this Agreement other than, to the extent it undertakes to service the Accounts, to service the Accounts in accordance with applicable law. Buyer shall remain bound by its obligations under this Agreement and nothing contained in this Section, nor any actions taken by Lender, shall relieve Buyer of any of its obligations under this Agreement.

Section 9.3     **Communication with Seller.** Any Downstream Buyer to whom Buyer transfers Accounts shall not have the right to contact Seller directly. Buyer shall remain Seller's counterpart and any communications between any such Downstream Buyer and Seller shall go through Buyer as the intermediary. Seller shall have the right, but not the obligation, to contact any Downstream Buyer directly if it receives collection complaints from any Obligor. In such case, Seller will notify Buyer of its direct communication with such Downstream Buyer.

Section 9.4     **Liability.** No sale or transfer of any Account by Buyer will relieve Buyer of any of its obligations or liabilities under this Agreement.

Section 9.5     **Provision of Information.** Buyer shall provide all Account Documents that it received from Seller to any Downstream Buyer. Buyer shall provide, at a minimum, the same Computer File fields that it received in connection with its purchase of the Accounts from Seller, updated as appropriate at the time of the sale of Accounts to a Downstream Buyer.

## ARTICLE X
## NOTICES

**Section 10.1**    **Notice Requirements.**    Unless otherwise provided for herein, notices and other communications required or permitted hereunder shall be in writing and shall be deemed to have been duly given (a) when delivered but no later than the second Business Day following mailing sent by overnight mail or overnight courier, or (b) when received, if sent by e-mail and an e-mail confirming receipt is sent by the recipient, in each case to the parties as set forth below (or at such other addresses as shall be specified by like notice).

**Section 10.2**    **Notices to Seller.**    Ron Satija, Chapter 7 Trustee for
Debtor Collins Asset Group, LLC
P.O. Box 660208
Austin, Texas 78766-7208
Tel: ▮▮▮▮▮▮▮▮
E-Mail: ▮▮▮▮▮▮▮▮▮▮▮▮

copy:    Dykema Gossett PLLC
112 E. Pecan Street, Suite 1800
San Antonio, Texas 78205
Attn: ▮▮▮▮▮▮▮
Tel: ▮▮▮▮▮▮▮
E-Mail: ▮▮▮▮▮▮▮▮▮▮▮

**Section 10.3**    **Notices to Buyer.**    Meadow River Investments II, L.L.C.
100 North Center Street
Newton Falls, Ohio 44444
Attn: ▮▮▮▮▮▮▮
Tel: ▮▮▮▮▮▮▮
E-Mail: ▮▮▮▮▮▮▮▮▮▮

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

**Section 11.1**    **Off-Bureau Accounts.**    The parties acknowledge and agree that many Accounts may be Off-Bureau Accounts as of the Closing Date.

**Section 11.2**    **Out-of-Statute Accounts.**    The parties acknowledge and agree that many Accounts may be Out-of-Statute Accounts as of the Closing Date.

**Section 11.3**    **Severability.** If any term, covenant, condition or provision hereof is unlawful, invalid, or unenforceable for any reason whatsoever, and such illegality, invalidity, or unenforceability does not affect the remaining parts of this Agreement, then all such remaining parts hereof shall be valid and enforceable and have full force and effect as if the invalid or unenforceable part had not been included.

**Section 11.4**    **Rights Cumulative; Waivers.** The rights of each of the parties under this Agreement are cumulative and may be exercised as often as any party considers appropriate under the terms and conditions specifically set forth. The rights of each of the parties hereunder shall not be capable of being waived or varied other than by an express waiver or variation in writing. Any failure to exercise or any delay in exercising any of such rights shall not operate as a waiver or variation of that or any other such right. Any defective or partial

Docusign Envelope ID: F559553A-EC65-8C05-8214-B9A3D5C9D549

exercise of any of such rights shall not preclude any other or further exercise of that or any other such right. No act or course of conduct or negotiation on the part of any party shall in any way preclude such party from exercising any such right or constitute a suspension or any variation of any such right.

**Section 11.5**  **Headings.** The headings of the Articles and Sections contained in this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provision hereof.

**Section 11.6**  **Construction.** Unless the context otherwise requires, singular nouns and pronouns, when used herein, shall be deemed to include the plural of such noun or pronoun and pronouns of one gender shall be deemed to include the equivalent pronoun of the other gender.

**Section 11.7**  **Binding Effect.** Subject to the approval of the Bankruptcy Court (as evidenced by a Sale Order), this Agreement and the terms, covenants, conditions, provisions, obligations, undertakings, rights and benefits hereof, including the Addenda, Exhibits and Schedules hereto, shall be binding upon, and shall inure to the benefit of, the undersigned parties and their respective heirs, executors, administrators, representatives, successors, and assigns.

**Section 11.8**  **Prior Understandings.** This Agreement supersedes any and all prior discussions and agreements between Seller and Buyer with respect to the purchase of the Accounts and other matters contained herein, and this Agreement contains the sole and entire understanding between the parties hereto with respect to the transactions contemplated herein.

**Section 11.9**  **Integrated Agreement.** This Agreement, including all Addenda, Exhibits and Schedules hereto constitute the final complete expression of the intent and understanding of Buyer and Seller. This Agreement shall not be altered or modified except by a subsequent writing, signed by Buyer and Seller.

**Section 11.10**  **Counterparts and Electronic Signatures.** This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and either party hereto may execute this Agreement by signing any such counterpart. Any person may execute this Agreement or its exhibits electronically and have their signature acknowledged by an online notary public. Electronic signatures shall constitute original(s).

**Section 11.11**  **Non-Merger/Survival.** Each and every covenant hereinabove made by Buyer or Seller shall survive the delivery of the Transfer Documents and shall not merge into the Transfer Documents, but instead shall be independently enforceable.

**Section 11.12**  **Governing Law/Choice of Forum.** This Agreement shall be construed, and the rights and obligations of Seller and Buyer hereunder determined, in accordance with the law of the State of Texas, without giving effect to any choice of law principles. Buyer unconditionally and irrevocably consents to submit to the exclusive jurisdiction of the Bankruptcy Court for any actions, suits or proceedings arising out of or related to this Agreement (and Buyer agrees not to commence any action, suit or proceeding relating thereto except in the Bankruptcy Court) and Buyer further agrees that service of any process, summons, notice or document by certified mail to Buyer's address as set forth herein shall be effective service of process for any action, suit or proceeding brought against Buyer in the Bankruptcy Court. In the event of litigation under this Agreement, the prevailing party shall be entitled to an award of attorneys' fees and costs. Each party to this Agreement unconditionally and irrevocably waives, to the maximum extent allowed by law, any right

to a jury trial for any claim or action arising out of this Agreement. Any such claim or action shall be heard before a judge and not a jury.

**Section 11.13**   **No Third-Party Beneficiaries.** This Agreement is for the sole and exclusive benefit of the parties hereto, and none of the provisions of this Agreement shall be deemed to be for the benefit of any other person or entity unless specifically provided for herein.

**Section 11.14**   **Confidentiality.** Buyer and Seller shall keep the terms of this Agreement confidential, both during and following the term hereof. Notwithstanding the foregoing, Seller and Buyer will obtain the approval of each other before issuing, or permitting any agent or affiliate to issue, any press releases or otherwise making or permitting any agent or affiliate to make any public statements with respect to this Agreement and the transactions contemplated hereby; provided however, that this provision will not restrict either party from issuing any press release or public statement required by regulation or applicable law.

**Section 11.15**   **Role of Garnet Capital.** Loan Sale Advisor is acting solely as a loan sale advisor for Seller (and escrow agent for Seller and Buyer, if applicable) under this Agreement with only those obligations expressly set forth herein. Buyer hereby acknowledges that (i) Loan Sale Advisor has not validated or made any effort to validate, and does not assume responsibility for, the accuracy, completeness, or validity of the information pertaining to Accounts, the documents related to Accounts, or any representations, warranties, or covenants made by Seller in connection with the transaction or the Accounts, (ii) Loan Sale Advisor makes no representation or warranties to Buyer, including, without limitation, any representation or warranty as to the accuracy or completeness of the information provided by Loan Sale Advisor concerning the transaction or the Accounts and (iii) it is not relying upon statements or actions of Loan Sale Advisor in entering into this Agreement. Seller and Buyer acknowledge that the sole role of the Loan Sale Advisor is (a) having introduced the Seller and Buyer; and (b) and performing its specific obligations hereunder. Buyer and Seller each release and hold harmless Loan Sale Advisor, which shall be considered a third party beneficiary to this Agreement, from any and all claims, actions, demands, causes of actions and counterclaims of any kind and nature, and any and all liabilities, damages, costs and expenses (including, but not limited to, attorneys' fees) arising therefrom, whether known or unknown, which either Seller or Buyer have or may have against Loan Sale Advisor now or in the future, individually and/or collectively, in connection with the transactions related to or arising under this Agreement or any exhibit, addendum, schedule or attachment hereto, including, but not limited to, the performance of the Accounts sold hereunder or any accounting treatment regarding the transactions or the Accounts.

**Section 11.16**   **Bankruptcy Court Approval:** Buyer acknowledges that this Agreement and any sale of the Accounts is subject to approval by the Bankruptcy Court by separate motion and order.

[REMAINDER OF PAGE INTENTIONALLY BLANK – SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement.

SELLER:                                              BUYER:

                                                     Meadow River Investments II, L.L.C.

By: _____          By: _____
Ron Satija, Chapter 7 Trustee for            Name: William Shaulis
Debtor Collins Asset Group, LLC              Title: Manager


ACKNOWLEDGED AND AGREED TO WITH RESPECT TO <u>SECTIONS 2.3 AND 2.4</u> HEREIN:

**ESCROW AGENT:**

**Garnet Capital Advisors, LLC**

By: _____
Name: Andy Carlson
Title:    Partner

**EXHIBIT A**
**ACCOUNT SCHEDULE**

**Summary of Accounts Sold: Charged-Off Consumer Accounts**

**Closing Date: March 27, 2026**

| Account Classification | Aggregate Account Balances | Number of Accounts |
|---|---|---|
| Paid 2025 Forward | $21,772,286.96 | 1,627 |
| Residual | $2,840,722,618.50 | 261,274 |
| **Total:** | **$2,862,494,905.46** | **262,901** |

LIST OF ACCOUNTS TO BE ATTACHED

# EXHIBIT B
## BILL OF SALE AND ASSIGNMENT OF ACCOUNTS

Ron Satija, Chapter 7 Trustee ("Seller"), for the bankruptcy estate of Debtor Collins Asset Group, LLC, in TXWB Case No. 25-51660-cag, pending in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division, hereby absolutely sells, transfers, assigns, sets-over and conveys to Meadow River Investments II, L.L.C., a limited liability company organized under the laws of Ohio with an office at 100 North Center Street, Newton Falls, Ohio 44444 ("Buyer"), without recourse and without representations or warranties, express or implied, of any type, kind or nature except as set forth in the Agreement (hereinafter defined):

(a)     all of Seller's right, title and interest in and to each of the Accounts identified in the Computer File, and

(b)     all principal, interest or other proceeds of any kind with respect to the Accounts, but excluding any payments or other consideration received by or on behalf of Seller on or prior to October 21, 2025, with respect to the Accounts.

This Bill of Sale is being executed and delivered pursuant to and in accordance with the terms and provisions of that certain Purchase Agreement made and entered into by and between Seller and Buyer dated March 27, 2026 (the "Agreement"). The Accounts are defined and described in the Agreement and are being conveyed hereby subject to the terms, conditions and provisions set forth in the Agreement.

This Bill of Sale shall be governed by the laws of the State of Texas without regard to the conflicts-of-laws rules thereof.

EFFECTIVE: March 27, 2026                    SELLER:

                                             By:_____
                                             Ron Satija, Chapter 7 Trustee for
                                             Debtor Collins Asset Group, LLC

STATE OF TEXAS                    )
COUNTY OF [_____])

On [date], before me the undersigned officer, personally appeared Ron Satija, who acknowledged himself to be the Chapter 7 Trustee for Debtor Collins Asset Group, LLC, signer and sealer of the foregoing instrument, and that he/she as such officer, being authorized so to do, acknowledged the execution of the same to be his free act and deed as such officer and the free act and deed of said corporation.

IN WITNESS WHEREOF, I hereunto set my hand.

_____
Commissioner of the Superior Court
     Notary Public

Record Number:_____

127196.000001 4912-2344-1036.1

## EXHIBIT C
## LIMITED POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that Ron Satija, Chapter 7 Trustee, for the bankruptcy estate of Debtor Collins Asset Group, LLC, in TXWB Case No. 25-51660-cag, pending in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division ("Seller"), with respect to those certain purchased Accounts, described in that certain Purchase Agreement dated March 27, 2026 (the "Agreement") between Seller and Meadow River Investments II, L.L.C., an Ohio limited liability company ("Buyer"), hereby names, constitutes and appoints Buyer, or any of its authorized agents, employees or representatives, its duly authorized attorney and agent with limited power and authority as it relates to the Accounts to (i) endorse checks and other negotiable instruments which may be received by Buyer; (ii) perfect, maintain, and release any security interests; (iii) transfer and obtain any titles, evidence of ownership or Account Documents; (iv) settle any insurance claims or litigation and apply for any insurance, warranty or sales tax refunds; (v) file any transfer of claim associated with a filed bankruptcy claim; (vi) transfer or release any judgment; (vii) file or execute any document related to the collection of the Accounts; and (viii) to perform any and all acts relating to the Accounts which the undersigned was entitled to do as the owner of said Accounts. Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Agreement.

EFFECTIVE: March 27, 2026          SELLER:

                                   By:_____
                                   Ron Satija, Chapter 7 Trustee for
                                   Debtor Collins Asset Group, LLC


STATE OF TEXAS
COUNTY OF [_____]

On [date], before me the undersigned officer, personally appeared Ron Satija, who acknowledged himself to be the Chapter 7 Trustee for Debtor Collins Asset Group, LLC, signer and sealer of the foregoing instrument, and that he/she as such officer, being authorized so to do, acknowledged the execution of the same to be his free act and deed as such officer and the free act and deed of said corporation.

IN WITNESS WHEREOF, I hereunto set my hand.


_____
Commissioner of the Superior Court
      Notary Public

Record Number:_____

# EXHIBIT D
## CONSENT TO SUBSTITUTE NEW ATTORNEY

Ron Satija, Chapter 7 Trustee, for the bankruptcy estate of Debtor Collins Asset Group, LLC, in TXWB Case No. 25-51660-cag, pending in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division ("Seller"), hereby acknowledges that it has sold, assigned, and transferred certain judgments and all related rights, title, and interest to Meadow River Investments II, L.L.C., a limited liability company organized under the laws of Ohio with an office at 100 North Center Street, Newton Falls, Ohio 44444 ("Buyer"), pursuant to that certain Purchase Agreement dated March 27, 2026 (the "Agreement").

In connection with such transfer and sale, Seller hereby consents to Buyer substituting its own attorney of record in any and all legal actions, proceedings, or enforcement activities related to judgments or accounts in a legal proceeding identified in the Computer File referenced in the Agreement. Seller further authorizes Buyer to file any necessary documents with the appropriate courts or agencies to effectuate the substitution of Buyer's attorney in place of Seller's attorney of record.

This Consent shall serve as express written authorization for the substitution of Buyer's attorney for all purposes related to the enforcement, collection, or defense of the Accounts. Seller acknowledges that, upon filing of the substitution, Buyer's attorney shall have full authority to act in all respects as the attorney of record for the Accounts.

This Consent shall be governed by and construed in accordance with the laws of the State of Texas without regard to its conflicts-of-laws rules.

EFFECTIVE: March 27, 2026        SELLER:

By:_____
Ron Satija, Chapter 7 Trustee for
Debtor Collins Asset Group, LLC

**EXHIBIT E**
**SETTLEMENT STATEMENT**

Closing Date:          March 27, 2026

Cutoff Date:          October 21, 2025

Buyer Name:          Meadow River Investments II, L.L.C.

Seller Name:          Debtor Collins Asset Group, LLC., a Delaware limited liability company, through its Chapter 7 Trustee, Ron Satija, as appointed in TXWB Case No. 25-51660-cag

Amount Due at Closing:          $_____

The Amount Due at Closing is calculated as follows:
| | |
|---|---|
| Purchase Price: | $5,214,099.85 |
| Less Net Post-Cutoff Payments: | $ |
| Less Deposit: | $1,042,819.97 |
| Equals: Amount Due at Closing: | $ |

| Account Classification | Number of Accounts | Aggregate Account Balances | Purchase Price Percentage | Aggregate Allocated Purchase Prices | Net Post-Cutoff Payments |
|---|---|---|---|---|---|
| Paid 2025 Forward | 1,627 | $21,772,286.96 | 20.00% | $4,354,457.39 | |
| Residual | 261,274 | $2,840,722,618.50 | 0.03026140% | $859,642.46 | |
| Total: | 262,901 | $2,862,494,905.46 | 0.18215% | $5,214,099.85 | |

Seller's Wiring Instructions:

Bank Name:
Bank Address:
ABA:

Account Number:
Account Name:

Notify:

127196.000001 4912-2344-1036.1

**EXHIBIT F**
**AFFIDAVIT OF SALE OF ACCOUNT BY DEBT SELLER**

State of Texas, County of [County].

Ron Satija being duly sworn, deposes and says:

I am over 18 and not a party to this action. I am the Chapter 7 Trustee acting on behalf of the bankruptcy estate of Debtor Collins Asset Group, LLC, in TXWB Case No. 25-51660-cag, pending in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division ("Debt Seller").

On March 27, 2026, the undersigned sold a pool of charged-off accounts (the "Accounts") by a Purchase Agreement and a Bill of Sale to Meadow River Investments II, L.L.C. ("Buyer").

The records were incorporated into Debt Seller's records and are kept in the regular course of business.

I am not aware of any errors in these Accounts. The above statements are true to the best of my knowledge.

EFFECTIVE: March 27, 2026                 SELLER:

By:_____
Ron Satija, Chapter 7 Trustee for
Debtor Collins Asset Group, LLC

Sworn to before me [date].

_____
(Notary Stamp)

Record Number:_____

## EXHIBIT G
## WAIVER OF NOTICE OF TRANSFER OF CLAIM

Debtor Collins Asset Group, LLC ("Transferor"), has sold and assigned certain claims to Meadow River Investments II, L.L.C. ("Transferee"). Transferee is an Ohio limited liability company maintaining a place of business at 100 North Center Street, Newton Falls, Ohio 44444. Said claims arise from consumer credit accounts (the "Accounts") issued to individuals who have filed petitions commencing cases under the U.S. Bankruptcy Code. Proofs of claim with respect to the Accounts may have been filed under the following name:

Collins Asset Group

Collins Asset

CAG

Collins

Collins Financial

Collins Financial Group

Transferor consents to the attachment of a copy of this Waiver of Notice of Transfer of Claim to a Notice of Transfer of Claim filed by Transferee pursuant to Federal Rule of Bankruptcy Procedure 3001(e)(2). Transferor specifically waives the right to receive notice of and object to the filing of the Notice of Transfer of Claim. Transferor requests that Transferee be substituted for Transferor immediately upon the filing of the Notice of Transfer of Claim. A copy of this Waiver shall have the same force and effect as the original.

IN WITNESS WHEREOF, Transferor has executed this Waiver under its corporate seal by and through its duly authorized officer this day of March 27, 2026.

TRANSFEROR:

By:_____
Ron Satija, Chapter 7 Trustee for
Debtor Collins Asset Group, LLC

**EXHIBIT H**

**FORMER LEGAL ACCOUNTS AND/OR CURRENT LEGAL ACCOUNTS
WITH FEES OWED AFTER THE CLOSING DATE**

FORMER LEGAL ACCOUNTS
[List Accounts]

CURRENT LEGAL ACCOUNTS
[List Accounts]

Docusign Envelope ID: F559553A-EC65-8C05-821D9A3D5C9D949

## EXHIBIT I

**THIS HOLDBACK AGREEMENT** (this "<u>Holdback Agreement</u>") is made and entered into as of March 27, 2026, by and among Meadow River Investments II, L.L.C. a limited liability company ("<u>Buyer</u>"), Ron Satija, Chapter 7 Trustee, for the bankruptcy estate of Debtor Collins Asset Group, LLC, in TXWB Case No. 25-51660-cag, pending in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division ("<u>Seller</u>"), and **GARNET CAPITAL ADVISORS, LLC**, a Delaware limited liability company ("<u>Escrow Agent</u>").

**WHEREAS**, Seller and Buyer are parties to a certain Purchase Agreement, dated as of the date hereof (the "<u>Purchase Agreement</u>"), relating to Buyer's acquisition of certain loans from Seller, as more particularly described in the Purchase Agreement;

**WHEREAS**, pursuant to the Purchase Agreement, a Holdback Account was established, from which funds are to be disbursed, at certain times specified herein to either Seller or Buyer, or to both of them, in such amounts as may be required pursuant to this Holdback Agreement and the Purchase Agreement;

**WHEREAS**, Buyer and Seller have agreed to establish provisions for the holdback of funds from the Purchase Price in the amount the Holdback Amount. As agreed in the Purchase Agreement, the Holdback Amount will be deposited in the Holdback Account to be held by the Escrow Agent and disbursed by the Escrow Agent, all in accordance with the terms and provisions of this Agreement with the intention that such funds be subject to the terms and conditions set forth in the Purchase Agreement and this Agreement; and

**WHEREAS**, all capitalized terms herein and not defined herein shall have the same meanings ascribed thereto in the Purchase Agreement.

**NOW THEREFORE**, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

1. **Definitions.** The following terms are defined as follows:

"<u>Buyer Wiring Instructions</u>" means the wire instructions provided by Buyer to the Escrow Agent.

"<u>Escrow Agent Wiring Instructions</u>" means the wire instructions provided by Escrow Agent to Buyer.

"<u>Holdback Amount</u>" means an amount equal to $521,409.99.

"<u>Holdback Account</u>" means the non-interest-bearing account maintained by Escrow Agent at Peapack Gladstone Bank.

"<u>Seller Wiring Instructions</u>" means the wire instructions provided by Seller to the Escrow Agent.

"<u>Termination Date</u>" means July 30, 2026.

2. <u>Holdback Amount</u>. Pursuant to the terms of the Purchase Agreement Buyer shall deposit the Holdback Amount with Escrow Agent. Buyer shall wire such funds into the Holdback Account using the Escrow Agent Wiring Instructions. Subject to the terms and conditions hereof, Escrow Agent shall hold and disburse the Holdback Amount as directed herein. The Holdback Account

shall not accrue interest.

3.  <u>Request for Disbursement</u>.  The parties expect the Holdback Amount to be retained in the Holdback Account for up to one hundred twenty-five (125) days after the Closing Date, subject to the provisions of the Purchase Agreement.  Accordingly, when either Buyer or Seller believes that a disbursement of any amounts held in the Holdback Account is appropriate pursuant to the provisions of the Purchase Agreement, such party shall draft and file a motion for consideration and approval by the Bankruptcy Court, including, but not limited to, written notice to the Escrow Agent, Seller's counsel, and the other party.  Such notice shall detail the amount to be disbursed, the party to whom the amount should be disbursed, the reason for the disbursement, and the date on which the disbursement should occur.  Any such notice shall be provided by email using the instructions provided below.  Escrow Agent shall not make more than two disbursements in any calendar month.

Escrow Agent shall use its reasonable best efforts to complete such disbursement before close of business of the intended disbursement date, pending completion of the confirmation callback (if applicable) as provided below.

Upon receipt by Escrow Agent of a timely objection from either Seller or Buyer to disbursement of any amounts held in the Holdback Account, Escrow Agent shall continue to hold such funds until (i) Escrow Agent receives written notice executed by both Seller and Buyer directing the disbursement of such funds, or (ii) the final determination of the Bankruptcy Court after the expiration of all applicable appeals periods.

Upon disbursement of the full amount held in the Escrow Agent as set forth herein, this Holdback Agreement shall terminate.

4.  <u>Notices</u>.  Any written notices made hereunder shall be by email to the designee for such party as follows:

|  | NAME | EMAIL |
|---|---|---|
| TO BUYER: | ███████ | █████████████ |
| TO SELLER: | ███████ | █████ |
| COPY: | ████████ |  |
| TO ESCROW AGENT: | ██████ | ████████ |
| COPY: | █████ | ██████ |

5.  <u>Confirmation Callbacks Prior to Disbursement</u>.  Prior to disbursing any amounts equal to or exceeding $5,000, Escrow Agent shall confirm by telephone the wiring instructions to be used for such disbursement with the designee for the recipient party as follows; such recipient must provide the following PIN as part of the confirmation: ████

|  | NAME | PHONE NUMBER |
|---|---|---|
| BUYER: | ██████ | ██████ |
| SELLER: | █████ |  |

6.  <u>Miscellaneous</u>.

a.      Escrow Agent may rely and act upon any instrument or other writing reasonably believed by Escrow Agent to be genuine and purporting to be signed and presented by any person or persons purporting to have authority to act on behalf of Seller or Buyer, as the case may be, and shall not be liable in connection with the performance of any duties imposed upon the Escrow Agent by the provisions of this Holdback Agreement, except for Escrow Agent's own gross negligence or willful misconduct. Escrow Agent shall have no duties or responsibilities except those set forth in this Holdback Agreement.

b.      Escrow Agent shall be reimbursed by Seller and Buyer for any expenses (including reasonable legal fees and disbursements of outside counsel), including all of Escrow Agent's fees and expenses with respect to any interpleader action incurred in connection with this Holdback Agreement, and such liability shall be joint and several; provided, however, that, as between Seller and Buyer, the prevailing party (as determined by a court of competent jurisdiction after the expiration of all applicable appeals periods, beginning in the Bankruptcy Court) in any dispute shall be entitled to reimbursement by the losing party of any such expenses paid to Escrow Agent.

c.      The provisions of this Holdback Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by all parties hereto.

d.      This Holdback Agreement shall be construed, and the rights and obligations of Seller and Buyer hereunder determined, in accordance with the law of the State of Texas, without giving effect to any choice of law principles. Should the parties be unable to resolve any dispute regarding the disbursement of the Holdback Amount, then each party unconditionally and irrevocably consents to submit to the exclusive jurisdiction of the of the Bankruptcy Court for any actions, suits or proceedings arising out of or related to this Agreement (and Buyer agrees not to commence any action, suit or proceeding relating thereto except in such court) and Buyer further agrees that service of any process, summons, notice or document by certified mail to Buyer's address as set forth herein shall be effective service of process for any action, suit or proceeding brought against Buyer in such court. In the event of litigation under this Agreement, the prevailing party shall be entitled to an award of attorneys' fees and costs. Each party to this Agreement unconditionally and irrevocably waives, to the maximum extent allowed by law, any right to a jury trial for any claim or action arising out of this Agreement. Any such claim or action shall be heard before a judge and not a jury.

e.      This Holdback Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. All signatures of the parties to this Holdback Agreement may be transmitted electronically, and such electronic transmission will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces and will be binding upon such party.

f.      If any provision of this Holdback Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction. Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the parties hereto to the fullest extent permitted by law, to the

end that this Holdback Agreement shall be enforced as written.

IN WITNESS WHEREOF, the parties hereto have executed this Holdback Agreement as of the date set forth above.